UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHIRLEY TUFF
on behalf of S.L.T., a minor,

                Plaintiff,                           Civil Action No. 13-10540

       v.                              District Judge Nancy G. Edmunds
                                                Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] AND**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13]**

Plaintiff Shirley Tuff on behalf of her son S.L.T., a minor, appeals Defendant Commissioner of Social Security's ("Commissioner") denial of his application for supplemental security income. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 10, 13). For the reasons set forth below, this Court finds that the decision of the Administrative Law Judge is supported by substantial evidence. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 13) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## I. PROCEDURAL HISTORY

On March 2, 2010, Tuff applied for supplemental security income ("SSI") on behalf of her son S.L.T., asserting a disability onset date of December 1, 2004. (Tr. 141.) S.L.T. was seven months old on December 1, 2004. (*See* Tr. 141.) Because an earlier application for SSI was denied in a July 26, 2006 ALJ decision (Tr. 58-66), the alleged onset of disability date was amended to the application date, March 2, 2010 (Tr. 32.). S.L.T. was then five years old. (*See* Tr. 141.)

The Commissioner initially denied the March 2010 application on June 10, 2010. (Tr. 67.) Tuff requested an administrative hearing, and on August 2, 2011, she and S.L.T. appeared with counsel before Administrative Law Judge Jeanne M. VanderHeide, who considered S.L.T.'s case *de novo*. (Tr. 26–54.) In an August 26, 2011 decision, the ALJ found that S.L.T. was not disabled within the meaning of the Social Security Act. (*See* Tr. 21.) The ALJ's decision became the final decision of the Commissioner on December 5, 2012, when the Social Security Administration's Appeals Council denied Tuff's request for review. (Tr. 1.) Tuff filed this suit on February 8, 2013. (Dkt. 1, Compl.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). A child under age eighteen is considered "disabled" within the meaning of the Social Security Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be

2

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). The Social Security regulations set forth a sequential three-step process for determining children's disability claims: first, the child must not be engaged in substantial gainful activity; second, the child must have a severe impairment; and third, the severe impairment must meet, medically equal, or functionally equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *See* 20 C.F.R. § 416.924.

To meet a listed impairment, a child must demonstrate both "A" and "B" criteria of the impairment. *See* 20 C.F.R. pt. 404, subpt. P, app. 1. "Paragraph A of the listings is a composite of medical findings which are used to substantiate the existence of a disorder" whereas the "purpose of the paragraph B criteria is to describe impairment-related functional limitations which are applicable to children." *Id.* To be found disabled by meeting a listed impairment, the claimant must exhibit all the elements of the Listing. *See Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

If a child's impairment(s) do not meet a listed impairment, the impairment(s) may still be medically or functionally equal in severity and duration to the medical criteria of a listed impairment. *See* 20 C.F.R. §§ 416.926, 416.926a; *Vansickle v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 727, 729 (E.D. Mich. 2003) ("Medical equivalency is covered by 20 C.F.R. § 416.926; functional equivalency is covered by Section 416.926a."). "To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment." *Walls v. Comm'r of Soc. Sec.*,

No. 1:08CV254, 2009 WL 1741375, at *8 (S.D. Ohio June 18, 2009) (citing 20 C.F.R. §

416.926(a)).  A claimant can demonstrate medical equivalence in any of three ways:

> (1) by demonstrating an impairment contained in the Listings, but which does not exhibit one or more of the findings specified in the particular listing, or exhibits all of the findings but one or more of the findings is not as severe as specified in the particular listing, if the claimant has other findings related to his impairment that are at least of equal medical significance to the required criteria;
>
> (2) by demonstrating an impairment not contained in the Listings, but with findings at least of equal medical significance to those of some closely analogous listed impairment; or
>
> (3) by demonstrating a combination of impairments, no one of which meets a Listing, but which in combination produce findings at least of equal medical significance to those of a listed impairment.

*Koepp v. Astrue*, No. 10-C-1002, 2011 WL 3021466, at *10 (E.D. Wis. July 22, 2011) (citing 20

C.F.R. § 404.1526(b)); *see also* 20 C.F.R. § 416.926. "The essence of these subsections is that

strict conformity with the Listing Requirements is not necessarily required for a finding of

disability." *Emeonye v. Astrue*, No. 04-03386, 2008 WL 1990822, at *4 (N.D. Cal. May 5,

2008). Thus, "[i]f a plaintiff is only able to demonstrate most of the requirements for a Listing or

if he or she is able to demonstrate analogous or similar impairments to the impairments of a

Listing, the plaintiff may nonetheless still satisfy the standards if the plaintiff can show

impairments of equal medical significance." *Id.*

       To determine functional equivalence, an ALJ is to evaluate six domains of functioning:

(1) acquiring and using information, (2) attending and completing tasks, (3) interacting and

relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6)

4

health and physical well-being. *See* 20 C.F.R. § 416.926a. Functional equivalence to a listed impairment exists when the child has an extreme limitation in one domain or marked limitations in two of the six domains. *See* 20 C.F.R. § 416.926a(d). A marked limitation results if the child's impairment(s) seriously interferes with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An extreme limitation exists when a child's impairment(s) very seriously interferes with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation is the equivalent of the functioning expected to be found on standardized testing with scores that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(3).

At step one, ALJ VanderHeide found that S.L.T. had not engaged in substantial gainful activity since March 2, 2010, the application date. (Tr. 13.) At step two, she found that S.L.T. had the following severe impairments: asthma, eye problems, and a nonverbal learning disorder. (*Id.*) She found the following impairments non-severe: allergic rhinitis, bilateral otitis media, and a history of fluid on the brain. (Tr. 14.) At step three, the ALJ concluded that S.L.T. did not have an impairment or combination of impairments that met or medically equaled the criteria of the listings. (*Id.*) The ALJ also concluded that S.L.T. did not have an impairment or combination of impairments that functionally equaled the listings. (Tr. 13–21.) Specifically, the ALJ found that S.L.T. had marked limitation in one domain (health and physical well-being), less than marked limitation in two domains (acquiring and using information, moving about and manipulating

5

objects), and no limitation in three domains (attending and completing tasks, interacting and relating with others, and caring for himself). (*Id.*) The ALJ therefore concluded that S.L.T. was not disabled as defined by the Social Security Act from March 2, 2010, through the date of her decision. (Tr. 25.)

## III. THE ADMINISTRATIVE RECORD

### A. Testimony at the Hearing Before the ALJ

At the hearing, Tuff testified that S.L.T. recently completed the first grade, but she was unsure yet whether he would have to repeat it. (Tr. 34.) It was unclear from her testimony whether S.L.T. was in special education classes; she said he was moved in kindergarten from one class to another "with less children and children that have I guess you can call it special needs." (Tr. 34–35.) She said at a meeting with his school, "they were telling me to just give him a little bit more time and let him focus in and, you know, be around other children his age. But it seemed as though when his prescription changed in his glasses, and every time he had eye exams and stuff like that, there were more and more complications." (Tr. 35.)

Tuff testified that S.L.T., then seven years old, was able to read short stories, repeat stories he had heard, explain why he did something, answer the phone, count money, add and subtract numbers over ten, communicate complete thoughts, express opinions, understand and participate in class discussions, watch an entire TV show or movie without being distracted, take turns appropriately in games or sports, complete chores, pay attention when spoken to directly, work at a reasonable pace to complete things, carry out multi-step instructions, work with others in a group, express anger appropriately, keep up with other kids in games or activities, work the

controls for video games, write legibly, express how he feels, and distinguish right from wrong. (Tr. 35–42.) When asked whether S.L.T. could understand oral instructions, Tuff said "[s]ometimes he'll ask you to repeat it, and sometimes he'll try to go ahead and go on and do what he thinks he was told to do. And he'll try to come back later and figure out if . . . it was the right thing or not." (Tr. 36–37.) When asked whether he could keep busy on his own, she said, "Yes, but sometimes he'll get bored easily and he'll try to figure out something else to do." (Tr. 37.) Most of the time, she said, he was not able to work or play without distracting others, but he was able to change from one activity to another without being disruptive. (Tr. 38, 39.)

Tuff also testified that S.L.T. did not have any issues with standing, balancing, bending, kneeling, crouching, walking, running, or jumping. (Tr. 42.) He was "really good" at taking care of himself, and able to make himself a simple snack. (Tr. 42.) He did "a really good job" with his chores, including taking out the trash and helping with the dishes. (Tr. 43.)

Tuff said that S.L.T. had friends his own age, and was able to make friends easily and keep them. (Tr.39.) He also got along well with adults, was cooperative at home, respected and obeyed adults in authority, and was "very good" about asking permission. (Tr. 40.) She said he was sometimes aggressive, meaning he would "yell and scream, or he'll kick his sister." (Tr. 43.)

Tuff said S.L.T. used an inhaler, air purifier, and nebulizer. (Tr. 44–45.) He used the inhaler every day when it was hot out. (*Id.*) She said he tended to get hot and had difficulty breathing in the heat, even near the fan or air conditioner. (Tr. 44.) He used the nebulizer about three times a day in winter and when it was hot. (*Id.*) Tuff said she often took S.L.T. to the emergency room for asthma attacks when he was in distress and breathing heavily, but "a lot of

times they'll just send us right back home the same way he came in, and saying he won't have to be admitted because it's not as bad." (Tr. 46.)

When asked how S.L.T.'s impairments affected him, Tuff testified that his breathing problems stopped him from running and playing and riding his bike and being outside when there was heat or pollen. (Tr. 47.) His asthma also sometimes limited indoor activities such as vacuuming. (*Id.*) He was supposed to wear eye patches to correct his eye movements, but he only wore them two to six hours a day because they made it difficult to focus. (Tr. 48.) He received a new prescription for glasses every couple months. (Tr. 48.) He had to stand close to the television or chalkboard to see it, and had trouble riding straight on his bike. (Tr. 49.) Tuff said his grades in school dropped because of his vision problems. (Tr. 50.)

When questioned by the ALJ, S.L.T testified that he liked to ride his bike, play with cars, and draw. (Tr. 51–52.) He said he had friends he played with at school but not at home. (Tr. 52.) He said his favorite part of school was reading books. (Tr. 53.)

**B. School Records**

The administrative record contains a Social Security Administration ("SSA") "Teacher Questionnaire" completed by S.L.T.'s kindergarten teacher on March 21, 2010 (Tr. 157–64), a May 2010 Kindergarten Progress Report (Tr. 182), a Teacher Questionnaire completed by S.L.T.'s first-grade weekly after-school reading tutor (Tr. 195–202), two first-grade report cards (Tr. 208–209), an SSA "Request for Administrative Information" completed by the school psychologist at S.L.T.'s elementary school on March 18, 2010 (Tr. 232–33), and a printout of S.L.T.'s reading assessment scores as of March 2010 (Tr. 234–35.)

These records establish that S.L.T. was not in a special education class. (Tr. 157, 232.) The school psychologist did indicate that "the school RC Team will meet on 3/31/10 to discuss modifications in the General Ed. Classroom." (Tr. 232; *see also* Tr. 164.)

According to the Teacher Questionnaires, S.L.T. did not have an unusual degree of absenteeism. (Tr. 157, 163, 195.) S.L.T.'s June 2011 first-grade report card, however, indicated that he was absent 25 out of 92 days. (Tr. 208.)

Both Teacher Questionnaires indicated that no problems were observed in two functional domains: interacting and relating with others, and caring for himself. (Tr. 160, 162, 198, 200.) The first-grade tutor also indicated no problems in the domain of moving about and manipulating objects (Tr. 199), but the kindergarten teacher indicated "slight" problems (two on the five-point scale) in two of the seven activities in that domain: "managing pace of physical activities or tasks" and "showing a sense of body's location and movement in space" (Tr. 161). The kindergarten teacher wrote: "[S.L.T.] with his vision at times has walked into doors, walls, lockers. He must tilt his head to be in focus." (Tr. 161.)

In the domain of acquiring and using information, S.L.T.'s kindergarten teacher indicated a "serious" problem (four on a scale of one to five) in "reading and comprehending written material," as well as five "obvious" problems (three on the five-point scale), and three "slight" problems. (Tr. 158.) The tenth activity was not rated. (*Id.*) She wrote:

> [S.L.T.] is displaying difficulty remembering and applying what he has learned. [He] can learn the small, independent material . . . but he cannot apply to sound out a simple word or a sound at the beginning of a word. There are times he surprises me and will do applications of learned material.

9

(*Id.*) S.L.T.'s first-grade reading tutor indicated no "serious" or "very serious" problems in this domain, but she did indicate four "obvious" problems and five "slight" problems. (Tr. 196.) The tenth activity was not rated. (*Id.*) She wrote: "[S.L.T.] needs extra time/help in completing tasks. He has been placed in a smaller class and is attending tutorial program." (*Id.*)

In the domain of attending and completing tasks, S.L.T.'s kindergarten teacher indicated one "obvious" problem, in "working at a reasonable pace/finishing on time." (Tr. 159.) She also indicated five "slight" problems. (*Id.*) The other seven activities were marked "no problem" (one on the five-point scale). (*Id.*) She wrote: "[S.L.T.] needs support following along and completing assignments. [He] has difficulty with his vision. He sometimes loses his place of where and what he should be doing." (*Id.*) S.L.T.'s first-grade reading tutor indicated a "very serious" problem in "working at reasonable pace/finishing on time." (Tr. 197.) She indicated "serious" problems in two other areas: "focusing long enough to finish assigned activity or task" and "completing work accurately without careless mistakes." (*Id.*) She also indicated "obvious" problems in two areas and "slight" problems in two areas. (*Id.*) The other five activities were marked "no problem." (*Id.*)

### C. Medical Records

Three medical consultants signed an SSA "Childhood Disability Evaluation Form" on June 9, 2010: Manoranjitham Kulathungam, M.D., Pediatrics; Julian Goldberg, M.D., Ophthalmology; and Charles Lawrence, Ph.D., Psychology. (Tr. 263.) They concluded that S.L.T.'s impairments—nonverbal learning disorder, asthma, left exotropia, and latent nystagmus with optic nerve pallor (atrophy)—were severe, but did not meet, medically equal, or

10

functionally equal the listings. (Tr. 262.) Their conclusion regarding functional equivalence was based on findings that S.L.T had less than marked limitations in three domains: acquiring and using information, moving about and manipulating objects, and health and physical well-being; and no limitation in three domains: attending and completing tasks, interacting and relating with others, and caring for himself. (Tr. 264–65.) The "Explanation of Findings" section of the form referred to a April 12, 2010 "Case Analysis" signed by Dr. Goldberg, in which he summarized the medical records pertaining to S.L.T.'s vision and concluded that S.L.T.'s visual impairment was severe. (Tr. 239, 267.) It also referred to a May 28, 2010 Case Analysis completed by Dr. Lawrence, in which he summarized a May 6, 2010 psychological consultative examination performed by Dr. Nick Boneff, Ph.D.; noted that S.L.T.'s "school records did not include test results or a diagnosis by a qualified source of mental [medical evidence of record]"; and concluded that "the mental impairment is severe, but there are no marked mental functional limitations." (Tr. 259, 267.)

Dr. Boneff, a fully licensed psychologist, saw and evaluated S.L.T. on May 6, 2010, at the request of the SSA examiner. (Tr. 250.) Dr. Boneff diagnosed non-specific, non-verbal learning disability and borderline intellectual functioning, and assessed a Global Assessment of

11

Functioning ("GAF") score of 53. (*Id.*)[1] He administered a Wechsler Preschool and Primary Scale of Intelligence test, on which S.L.T.'s "intellectual functioning was measured to vary with verbal IQ of 85 in the low average range, and performance IQ of 70 and full scale IQ of 74 both in the borderline range." (Tr. 253.) Dr. Boneff concluded that S.L.T.

> does have a number of cognitive capacities, which should stand him in good stead in school type activities, with more capacity at this point for verbal rather than non-verbal areas of functioning as mentioned. He does have the cognitive capacities to be able to engage with relative success in verbally based school type activities at the present rate, absent interference from his eye conditions or other learning difficulties.

(Tr. 254.)

The administrative record includes medical records from Detroit Medical Group for 16 appointments between January 2006 and May 2011, for regular treatment of S.L.T.'s asthma as well as colds, ear infections, a sore throat, a head injury, sleep problems, and immunizations. (*See* Tr. 362–71, 382–401.)

Appointments with an eye specialist are also documented: three in 2004, two in 2005, one in 2006, one in 2007, and three in 2009. (*See* Tr. 214–16, 376–81, 402–407.) In November 2004, Dr. John D. Roarty of Children's Eye Care Detroit wrote that his examination

---

1 A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"),* 30–34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF score of 51 to 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

demonstrated "congenital motor nystagmus with fine horizontal pendular nystagmus worse in the left eye than the right eye," but noted that S.L.T. did "fix, follow, and track well and he [was] very alert visually." (Tr. 376.) In February 2011, Dr. Roarty wrote "To Whom It May Concern":

> [S.L.T.] has a problem with a high degree of nearsightedness, paleness of the optic nerves and a muscle control problem. Because of this, he has some limitation of his visual function and does not have normal 20/20 sight. His best corrected vision is 20/50 in the right eye and 20/200 in the left eye. Though this is not considered visually impaired, he does have a significant functional issue.
>
> We have recommended that he sit in front of the class to allow him to compensate for some of his visual deficits. Additionally, reading materials and other things should be blown up to make it easier for him to read. He will also need to hold reading material closer than the average child to be able to read it well. Finally, it is possible that because of the vision problems, additional tutoring and/or time on exams would be helpful.

(Tr. 402.)

In October 2007, S.L.T. was examined by a neurologist, who concluded that he had "torticollis secondary to eye problems, most likely misalignment." (Tr. 350.) Torticollis is abnormal contraction of the muscles of the neck, producing twisting of the neck and an unnatural position of the head. *Dorland's Illustrated Medical Dictionary* (31st ed. 2007).

The record also includes records for emergency treatment at Detroit Medical Center Children's Hospital. S.L.T. was seen there 20 times between May 2004 and July 2010, primarily for exacerbation of his asthma due to colds. (*See* Tr. 221–31, 241–47, 268–74, 277–85, 288–92, 296–307, 311–47, 351–61.) S.L.T. and his mother were typically discharged home with instructions to continue using the inhaler and nebulizer. (*See id.*) Chest x-rays were taken on

13

several of these visits and found to be generally normal. (*See* Tr. 227, 273, 281, 300, 314, 330, 335, 340, 355.)

## IV. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v.*

*McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## V. ANALYSIS

### A. Listing 112.05

Plaintiff first argues that the ALJ incorrectly found that S.L.T. did not meet a listing because S.L.T met the Listing for mental retardation, 112.05. (Pl.'s Mot. at 6–7.) Plaintiff says that under Listing 112.05(D), a claimant can meet the listing for mental retardation if he has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.05(D). The consultative examiner assessed S.L.T.'s performance IQ score as 70 (Tr. 253), and Plaintiff argues that this score and S.L.T.'s "eye problems which significantly limit his ability to function" satisfy the Listing criteria. (Pl.'s Mot. at 7.)

Defendant argues that Plaintiff misunderstands the Listing requirements, and that the criteria in Listing 112.05(D) are not enough; in addition, Defendant says, "a claimant must meet the diagnostic description at the beginning of Listing 112.05," which requires "significantly

15

subaverage *general* intellectual functioning with deficits in adaptive functioning." (Def.'s Mot. at 5–6 (quoting § 112.05 (emphasis added) and citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)).) According to Defendant, the record does not establish "significantly subaverage general intellectual functioning with deficits in adaptive functioning" because "[b]oth psychologists in the record concluded that S.L.T. had a nonverbal learning disorder; neither diagnosed mental retardation," and "the ALJ's discussion of S.L.T.'s abilities shows that he did not have the requisite deficits in adaptive functioning." (Def.'s Mot. at 6, 7.) The Court agrees.

Listing 112.5 for mental retardation provides:

> Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning. The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied. . . .
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function . . . .

20 C.F.R. pt. 404, subpt. P, app. 1 § 112.05. In *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001), the Sixth Circuit discussed the parallel adult listing for mental retardation, Listing 12.05. There, the introductory paragraph contains the additional requirement that the "significantly subaverage general intellectual functioning with deficits in adaptive functioning" must have "initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05. It was this requirement that the court focused on in *Foster*: "Foster has failed to show that her general intellectual functioning was 'significantly subaverage' prior to that age. . . . Moreover, the evidence does not demonstrate or support onset of 'deficits in adaptive functioning' before

16

age 22." *Foster*, 279 F.3d at 355. The court found that a recent amendment to the regulations had made clear that the introductory paragraph in Listing 12.05 is a separate requirement from the criteria in §§ 12.05(A)–(D). *Foster*, 279 F.3d at 354 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A), *as amended by* 65 Fed. Reg. 50746, 50776 (August 21, 2000)). Similarly, the introduction to the Commissioner's mental disorders listings for children now explains: "Listing 112.05 (Mental Retardation) contains six sets of criteria. If an impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the six sets of criteria, we will find that the child's impairment meets the listing." 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.00(A) (emphasis added). Defendant is clearly right that Listing 112.05 requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning" in addition to the criteria in (D).

In finding that S.L.T.'s impairments did not meet or medically equal a listing, the ALJ said that she "considered all of the claimant's impairments individually and in combination but can find no evidence that such impairments reach the level of severity in the listings." (Tr. 13.) This explanation of her reasoning is quite thin. Nonetheless, three medical experts with appropriate specialties—a pediatrician, an ophthalmologist, and a psychologist—who were familiar with the childhood disability listing requirements reviewed the record, including the IQ test results, and concluded specifically that S.L.T. did not meet or equal the Listings. Plaintiff

17

has not pointed to any evidence that undermines their conclusion.[2] The ALJ's finding that S.L.T. did not meet or medically equal a listing is supported by substantial evidence.

### B. Functional Limitations

Plaintiff also argues that the ALJ erred in finding that S.L.T. had a less than marked limitation in the areas of "acquiring and using information" and "attending and completing tasks" because she failed to consider certain evidence. (Pl.'s Mot. at 8–10.) Specifically, Plaintiff says the ALJ failed to consider S.L.T.'s performance IQ score of 70, the May 11, 2011 teacher questionnaire, and the March 21, 2010 teacher questionnaire. (*Id.*)

Defendant argues that the ALJ necessarily considered the performance IQ score when she noted "the full-scale IQ score, which is a combination of the examinee's verbal and performance," and that "Plaintiff places excessive reliance on an IQ test score despite the examining psychologist's implied conclusion that S.L.T. was functioning better than that score would suggest, including by being 'at grade level' and possessing 'moderate to significant cognitive strengths.'" (Def.'s Mot. at 12, 13.)

The Court agrees that the ALJ properly considered S.L.T.'s IQ scores. Although she did not state the IQ scores specifically, she assigned great weight to the psychological report that contained them: "In May 2010, a Disability Determination Services psychologist opined that the claimant did not have any marked mental functional limitations (Exhibit B14F). This opinion

---

2 Although the ALJ assigned their opinion only "some weight," the only respect in which her findings differed from theirs was in her finding that S.L.T. had marked limitation in his health and physical well-being, rather than the less than marked limitation the doctors found. (*See* Tr. 16–21, 264–65.) This difference in assessment of the physical effects of S.L.T.'s impairments is not implicated by the ALJ's finding as to the mental retardation Listing.

merits great weight because it is consistent with and supported by the record." (Tr. 14.) In addition, her finding that S.L.T. had less than marked limitations in the area of "acquiring and using information" and no limitation in the areas of "attending and completing tasks" is in accord with the opinion of Drs. Kulathungam, Goldberg, and Lawrence, who referred to the psychological report containing the IQ scores as a basis of their findings. (Tr. 264, 267.)

The Court cannot agree with Defendant that the ALJ properly considered the teacher questionnaires. (See Def.'s Mot. at 14, 18.) The ALJ's summary of the questionnaires provided only "averages," which omitted important information about S.L.T.'s functional limitations. (*See* Tr. 15.) Moreover, the ALJ stated: "Although appreciated by the undersigned for informational purposes, as pointed out in 20 CFR 416.913, the Social Security Administration does not rely on reports from teachers because teachers are not considered 'acceptable medical sources' under Social Security Law." (*Id.*) It is not correct that the Social Security Administration does not rely on reports from teachers. According to the regulations, non-medical sources such as the opinions of teachers may be used "to show the severity of your impairment(s) and . . . if you are a child, how you typically function compared to children your age who do not have impairments." 20 C.F.R. § 416.913(d). Social Security Ruling 06-03p provides that the ALJ "generally should explain the weight given to the opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 6, 2006). The Sixth Circuit has stated: "[w]hile the ruling notes that information from 'other sources' cannot establish the

19

existence of a medically determinable impairment, the information 'may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007).

Nonetheless, any error was harmless. The Court must consider the record as a whole to determine if the ALJ's decision was based upon substantial evidence. *See Heston*, 245 F.3d at 535 (holding ALJ's failure to discuss the opinion of a treating physician was harmless error).

First, the teacher questionnaires do not clearly evidence significant functional impairment. In the domain of acquiring and using information, out of ten activities, only one was rated as a serious problem by one of the teachers. The kindergarten teacher rated all activities as three out of five (where one indicates no problem and five indicates a very serious problem) or lower except one activity that she rated four out of five: "reading and comprehending written material." (Tr. 158.) The first-grade reading tutor did not rate any activity above three out of five, including "reading and comprehending written material." (Tr. 196.) In the domain of attending and completing tasks, the kindergarten teacher did not rate any activity above three out of five. (Tr. 159.) Of the thirteen activities for that domain, the first-grade reading tutor rated one as a five out of five ("working at reasonable pace/finishing on time") and two as four out of five ("focusing long enough to finish assigned activity or task" and "completing work accurately without careless mistakes." (Tr. 197.)

Second, the teachers' ability to evaluate S.L.T. was less than that of his mother or the psychologist who administered the IQ test. (Tr. 197.) S.L.T. was one of 22 students in the kindergarten teacher's class (Tr. 157), and the first-grade reading tutor saw S.L.T. only once a

week for 45 minutes with six other children (*see* Tr. 250, 195).

Third, the other evidence in the record substantially supports that S.L.T. had less than marked limitation in the domain of acquiring and using information and no limitation in the domain of attending and completing tasks. The medical experts who reviewed the record made identical findings. (Tr. 264–65.) The psychologist who personally evaluated S.L.T. concluded that he "does have the cognitive capacities to be able to engage with relative success in verbally based school type activities at the present rate, absent interference from his eye conditions or other learning difficulties." (Tr. 254.) And S.L.T.'s mother testified that he was able to read short stories, repeat stories he had heard, explain why he did something, answer the phone, count money, add and subtract numbers over ten, communicate complete thoughts, express opinions, understand and participate in class discussions, watch an entire TV show or movie without being distracted, complete chores, pay attention when spoken to directly, work at a reasonable pace to complete things, carry out multi-step instructions, keep up with other kids in games or activities, work the controls for video games, write legibly, and express how he feels. (Tr. 35–42.)

As Defendant points out, Plaintiff has not explained why the ALJ was required to credit the teacher questionnaires over the consultative examination, the state agency team's evaluation, and S.L.T.'s mother's testimony. (*See* Def.'s Mot. at 19.) The ALJ's findings that S.L.T had less than marked limitation in the domain of acquiring and using information and no limitation in the domain of attending and completing tasks were supported by substantial evidence, and any error in weighing the teacher questionnaires was therefore harmless.

21

## VI. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court finds that the decision of the Administrative Law Judge is supported by substantial evidence. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 13) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VII. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596–97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR

72.1(d)(3), (4).


Date:   December 31, 2013                          s/Laurie J. Michelson
                                                   Laurie J. Michelson
                                                   United States Magistrate Judge


                          CERTIFICATE OF SERVICE

        The undersigned certifies that a copy of the foregoing document was served on the
attorneys and/or parties of record by electronic means or U.S. Mail on December 31, 2013.


                          s/Jane Johnson_____
                          Deputy Clerk


                                      23